Provides the second case of the morning called 213-1232, Kevin Gloss v. Fox River Foods On behalf of the Avalon, Mr. Steven T. Mann On behalf of the Avalene, Jennifer Adams-Murphy Thank you. Mr. Mann, you may proceed.  Good morning, Your Honor. Your Honor, we're here this morning on the matter of Noss v. Fox River Foods. It was an amended complaint filed with two distinct counts and dismissed under 615. Briefly, the complaint itself relates events that happened to Mr. Noss, who was an employee at Fox River Foods. Mr. Noss had a situation where his truck was stuck in the mud, so to speak. It was towed out, and then a series of events happened that eventually led to his termination. In between there, there was a request for drug testing. The employer claimed that Mr. Noss, in essence, refused to go to this clinic. Well, he didn't take the drug test in a timely fashion, correct? He did not take the drug test when requested at the end of the day after driving for eight hours. Well, isn't that the point of a drug test is to take it as quickly as possible after the event that precipitates it? Judge, that is correct. That is the point of the drug test. And that is also, I think, in agreement in some of the federal regulations as well. If you have an accident, you need to have the test immediately. Regardless, Mr. Noss ended up going through an investigation on this particular matter. As we alleged and he alleged in his complaint, there was a system, a number of policies that existed at this employer that, in essence, heightened his job security. One such policy that's attached to the complaint is an accident policy that basically indicates that written warnings will be issued. The three written warnings will be caused for disciplinary action. Was he terminated because of the accident? Or was it a violation of the accident policy? The reason for the termination that was provided to Mr. Noss was that he refused to go to the drug clinic on the day of this incident when his truck became stuck in the mud. Now, there was never a specific policy that was ever tendered by the employer. This was actually asked for during unemployment administrative proceedings as well. No specific policy was actually ever tendered or identified that Mr. Noss was a violation of. Well, let me ask you this, though. I mean, you said that he was terminated because of the accident. What I'm getting at is, was the policy, I'm sorry, was he terminated because he was in an accident or was he terminated because he didn't do the drug test and is there a difference? There were two, to answer succinctly, we don't know. The reason, there was a reasoning that was given during unemployment proceedings, but there was a different reason that was given actually in written documentation in his personnel file. One of the documents that I've attached as an exhibit is called corrective action notice. Actually had a, I'm sorry, I think I'm confusing that. There was a notice that was provided of his termination. And in the other, there's an other checkbox that says Mr. Noss refused to go to the concentric drug clinic and therefore he's terminated. There was a theory that was manufactured during some of the unemployment hearings that there was an actual post-accessive policy or some sort of drug policy that he would have been a violation of. It was never provided. There was never any proof that he was specifically in violation of that, of any policy. That gets to count two, intentional interference. In the middle of these proceedings, Noss' counsel, that was me, communicated that in his personnel file that what they were indicating regarding why he was terminated was much different than what they were indicating in unemployment, in the unemployment proceedings. One of the specific points that was brought up was that no specific policy was ever tendered that he was a violation of. When Mr. Noss began looking for other employment, one of the rights that he has as a truck driver is to get his background investigation. His background investigation, after notice to Fox River Foods, indicated that he was terminated for not following company post-accident policy. Which was in direct contradiction of anything that had been brought up prior and no policy had ever been set forth. Your Honors, I cite to a number of cases regarding... And how would it affect your claim relative to, I think it's interference with a business relationship. As far as being an, if he is an at-will employee, and he hasn't proved that he's modified that at-will presumption in the state of Illinois. It's my understanding of the law judge that the wrongful termination, he's not going to have a wrongful termination claim here. But I view that separately from the intentional interference. So you're saying that an at-will employee might or may have a cause of action for an interference if the reason given is erroneous when inquiry is made as to the reason for termination? That is correct. It's our position that if there is misinformation provided to other employees, that other employers are looking at regarding the hire of this employee, and it's incorrect. That he can stand on a cause of action for interference with employment expectancy. And would your claim that your client was improperly discharged because there was an employment contract have any impact on the second claim relating to interference? Does it make any difference whether or not he's an at-will employee or whether he's under contract as to that particular claim? As to the intentional interference claim? Yes. I view those as distinct claims. The wrongful termination claim is a claim that's based on Mr. Knox's enhanced procedural rights to warnings, to notices, to potentially rehabilitation, to an investigation, which did occur here prior to his discharge. However, that being what it is, he was terminated. There were reasons set forth. And those reasons, whatever they are, were communicated to third parties. We were obviously in disagreement with those reasons. We communicated that to the employee. And as such, that forms the basis. His termination and the events surrounding it form the basis of the second account. What's the misinformation that was disseminated? The misinformation was the fact that he was in violation of some post-accident policy, company policy, or of any policy, Your Honor. Well, is it because they said it was a policy that he violated, or was it the conduct, failure to take the test, the drug test? They, what was communicated to the third parties was that he was in violation of post-accident policy, company policy. Was that the end all, be all, or was there a further description of the basis? I know, and I don't, Your Honor, I don't believe, I think it was pretty succinct. Let me look at the background report here. Did not follow company post-accident policy. Verified reason for leaving. Would it have been better for your client if the thing would have said, refused to go for a drug test when ordered to do so after an accident? That would have been more factually accurate, but I don't know if it would have fared much better if that was said. And it's possible that we may have still had a count at that point, because we voiced a disagreement with the facts, both to the employer and in, before the administrative law hearings, that that was just incorrect. He did not refuse to go to that clinic. It may have still had a detrimental effect to him. He didn't go, did he? Did he go to the clinic? And he was told, I know he voiced his concern. I've been working a long time, and the weather's bad, it's rush hour, and it closes at 6, and now it's 5.30. And he was told, if I understand it correctly, he was told, well, give it a shot, go there, and if it's closed, call us from the parking lot. He didn't go, did he? He started to go, but what was communicated to him is that he could wait until the next day to, you know, to take the drug test. Prior to that, he had indicated that he had some concerns. He had concerns about the amount of time it was going to take him to get from Oswego to the Fox River Mall area, you know, traffic concerns, weather concerns. He didn't make an attempt to get there. That's the bottom line. Did he make a couple phone calls back to the employer saying, you know, I'm really tired, it's really yucky out, it's cold, it's raining? But never made it to the clinic? He never made it to the, yeah, he never made it to the clinic. I believe what was happening was when he got in, when his shift was over and he got into the station, the dispatcher there was communicating Kevin's concerns to his boss, who was not there. Was time of the essence relative to the drug test? Time of the essence meaning, for instance, if it was a DUI claim, then time is of the essence to the extent that alcohol can leave your body or be metabolized. But if it's something like marijuana or other drugs, they don't leave your body so quickly. So was time of the essence, was the test supposed to include alcohol? Or was it supposed to just deal with drugs that remain in the body for, say, more than 48 or 72 hours? And, Your Honor, we don't- That hasn't been discerned? It hasn't. We haven't gotten to the discovery phase on that yet. To discern, and it was never brought up in the administrative hearings either, what specifically they were going to test for. And we did point out, and it's brought up in our complaint as well, that there were 24-hour facilities out there as well that they used. And that's another matter for discovery, obviously. But the thing that's of concern to us is that they allowed him to continue to drive for eight hours after the truck was towed out. And even when he got back to the facility, they asked him to fill out a post-accident report prior to informing him that he needed to go in for drug testing. So if time was of the essence, it certainly wasn't communicated to Kevin Moss. You're getting to this policy issue. Isn't there a policy or wasn't there a policy somewhere in the record that if you didn't go for a drug test or a request that it was viewed as a positive result? There was never a written policy presented to that fact, but that issue did come up in an investigative memo by the HR director, where he specified that if you refuse to go, it is determined to be a positive result. However, that statement was never corresponded with an actual policy. And that's one of the things that we attempted to ascertain in the administrative proceedings, is what exactly, what policy were they following in requiring him to go do this drug test? Could it be seen? I mean, they have to give an answer. If somebody calls them or sends in this request under the federal regs, they have to give an answer, don't they, the defendant? That's correct. In the event of a background investigation, that's absolutely correct. So they had to say something. They couldn't say, well, we can't tell you. They had to say something as to why he was terminated. If this company falls under those regulations, which this particular company does as a transportation carrier, they would be required to report that. Yeah, correct. Does it almost seem like they were somewhat downplaying? Could it be argued that they were somewhat downplaying the reason for his dismissal in order to potentially not hurt his chances? That's not our position. What seemed to happen, even after it was communicated to them early on, before these background investigations were even conducted, is that you have not shown us a policy that he is in violation of. And it was actually, one of the letters was actually delivered to Diana Davis, who is the contact person on this background investigation. So she was aware. She had direct correspondence. And I actually asked for that correspondence to go in his personnel file. So what would have been in there, it would have been open and notorious. She would have been aware that there was a major disagreement as to that. But she went ahead and reported it anyway. You don't have to admit it or make an admission. But if we determine that this was an at-will employment, what difference does it make whether or not he's fired because he didn't take a test or didn't take a test within 24 hours or whatever? Well, it makes a difference because it's those types of statements that can affect his expectation of employment ongoing. And that's precisely what appears to have happened here. Thank you, Mr. Mayor. You have time for me by the way. Okay, thank you. Ms. Murphy, you may proceed. Good morning, Your Honors. Jennifer Murphy, I have a defendant respondent. You know, I'd like to just preliminarily note that all of the discussions regarding the Illinois Department of Employment Security administrative hearings are not admissible under the statute that we reference in our appellate brief. And there's obvious reasons why that is. There are different standards pertaining to Illinois claims for unemployment compensation. A lot of times those hearings aren't attended by attorneys. So all of this reference with regard to the hearings for the unemployment compensation are absolutely inappropriate. It's 820-ILCS-405-1900. I think counsel was referencing them, at least at this argument, in light of what policies he asked for and may have been given to him in discovery or for that proceeding. So what policies are we talking about here? Well, so our position is that the plaintiff was an employee at will. And there are a couple of reasons why. First of all, there was no handbook. This is not like most of the cases where the issue is whether or not there's a policy that's stated in a handbook, whether it's by disciplinary procedure or something else that might give rise to an employee believing that they have contractual rights. The basis that the plaintiff is asserting to try to negate employment at will is an accident policy, which, first of all, does not say that certain procedures have to be followed before someone would be disciplined. It only says that after three, you for sure will be disciplined. And second of all, is inapplicable to this case because he was not terminated because he was in an accident. He was terminated for insubordination because he refused to follow company procedures and go for the test when requested. The other basis that plaintiff seems to argue is that he was previously disciplined without having been terminated. Let's assume for a minute he is an at-will employee. Counsel has argued that with count two, the tortious interference count, that that doesn't matter. No. Whether he's at will or not doesn't matter. That is absolutely correct. And he's focused on the statement that the company gave to these prospective employers as being factually inaccurate. Right. And it is correct that the employer was under an obligation to respond to the request for information as to why plaintiff was terminated. Obviously, for the safety of the road, there are federal regulations that require that former employers be contacted and that the former employer respond to queries regarding a former employee. And there are penalties if the former employer does not respond. At the time that plaintiff was terminated, it was explained to him that he was terminated because he didn't go to take the drug screen when he was instructed to do so. Mr. Guajardo states that he told Mr. Nasr that he was suspended for insubordination by refusing to get a drug test as soon as he was instructed. These are issues which pretty clearly describe the situation which is admitted by plaintiff that he came back from his shift. He was told, you've got to go take your drug screen. He explained why he didn't think he should have to at that particular time. He did not begin to go. That's not alleged anywhere. He argued until finally the employer said, fine, don't go. If someone is an at-will employee, what difference does it make whether he violates company policy or whether he is, as you described, discharged for insubordination, which some people might think is for cause? It doesn't make any difference, but generally employers, even if at-will employees will have a reason for terminating people, just because employees are at-will doesn't mean that employers arbitrarily decide to terminate people. To ensure that there are proper personnel policies, employers generally do, good employers in my opinion, investigate allegations and they look into a situation and then they'll have a reason for terminating someone. But with regard to the stated reason, the reason that the employer gave in the response to the query was exactly the reason that he was given and was stated, that he didn't follow company post-accident policy. And it is correct, the employer did not go on and say he didn't follow post-accident policy by refusing to go for a drug test. It didn't write a narrative which could have been more harmful. It gave the bare bones information as it was required to do. If the employer had given any other response to that, the employer would have been lying and would have been subject to recourse as a result of giving false information. This was a very general but accurate statement as to what happened. And the accuracy of that statement is actually supported by the very documents that plaintiff attached to his complaint and his own allegations because the reason was the reason that occurred, that he didn't want to go. And the question with regard to tortious interference isn't, it's not a question of whether plaintiff agrees with the reason for his discipline. The question is whether the reason that was given in response to the query was the actual reason. And in this case, that was absolutely what happened. There are privileges which attach to these sorts of communication both under the federal regulations and also under Illinois common law. It's a qualified privilege that even if this was not, as I said, you know, if the plaintiff hadn't already established by his own pleadings that the statement that was given to the prospective employer was accurate, there would still be a privilege that would protect my client from the statements that were made under the federal regulations which bar actions for tortious interference unless there was a knowing misstatement essentially. And under the Illinois common law, if a statement is made with intent to do harm or with reckless disregard as to the truth or falsity, those facts are not alleged except in a very conclusory manner which is insufficient to support the allegation of tortious interference. And again, moreover, the fact is that the statement that was given is established as truthful by virtue of his own pleadings. Was there an accident policy? Yeah, it's actually attached to the complaint. And that's what you're describing as the accident policy, correct? Yes. And the accident policy simply says it warns drivers that if you're involved in three accidents, regardless basically of the severity, that there's going to be some discipline. The accident policy does not state that in the event of an accident you will not be terminated until XYZ happens. It does not say that we will not terminate you after one accident. It simply warns drivers that if you have three accidents, something's going to happen regardless. Does it say you must go for a drug test after each accident? Not in the accident policy. Okay, where's the policy that says that? And it says that if you don't go, it's considered a positive test. It's the separate drug policy. And that... It was produced in discovery? We didn't have discovery. This was dismissed as a 2615 motion. And, you know, the fact that he was terminated as a result of his failure to do what he was told to do doesn't establish... If he's an employee of the will, even if the employer was wrong to do that, it doesn't matter. How did the court dismiss the COW 2 on a qualified privilege under 615? Because the plaintiff, after two tries at pleading, didn't plead any facts to support that the statement to the prospective employer was made with actual malice. The only allegation was that it was conclusory. It stated what you have to show to plead actual malice, but there were no facts to support it which are necessary in order to overcome the privilege even on a pleading. And I believe the judge further noted that the stated reason was true. It was true by virtue of plaintiff's own pleadings. The documents that he attached to his complaint as well as his pleadings where he admitted that he didn't go for the drug test. He was terminated because he didn't go for the drug test, and that's exactly what they told the prospective employer. And the... Excuse me? Did he allege that he was told that he didn't have to go until tomorrow? He alleged that after... I mean, the story goes that he refused to go for the drug test. And after he refused, the employer said, okay, well, then just go. You know, we'll deal with this tomorrow. But that was after he had refused.  There's no policy that can be pointed to in... And we're kind of going back and forth between both counts because I guess to a certain extent they're sort of related. But there's no policy that plaintiff has pointed to, because there is none, that would alter the fact that he's an employee at will. And the policy in favor of employers of truck drivers disclosing information to prospective employers wants to encourage the disclosure of this information without employers having to concern themselves with liability by phrasing everything with specific particularity. And that's why if every employer who responds to one of these requests has to go through discovery and a trial, it defeats the purpose. And that's why we have the pleading requirements that he can meet. Is it possible that the plaintiff can achieve success under one of two theories? One theory is that he actually alleges a signed sealed contract employment. Or two, that he alleges an estoppel based upon a policy that would prevent your client from claiming an at will employment. I do not believe that there's any kind of estoppel applicable here. I suppose in some situation there could be an estoppel, but I don't believe that there's anything here that could give rise to an estoppel. Let's look at it through the telescope in the opposite direction, which is instead of creating an estoppel, would the implementation of a policy create a contractual arrangement, at least insofar as that particular policy is concerned? And the reason why I'm asking that question is because you seem to, I won't say anticipate the point, but you are refuting it to the extent that you have repeatedly stated that there are aspects of the accident policy that don't prevent you or your client from firing the individual based upon their exercise of discretion. Because they didn't say that you will have a hearing on a termination for anything less than three accidents, etc. So is there a situation where had there been some more specific policy that might have created a right to a hearing or some sort of due process? Yes. I mean, if an employer has a policy and that policy says, for example, in the event of theft, there will be an investigation, you'll have the right to present witnesses, and only after a thorough investigation may the employer determine to terminate someone. That would give rise, I suspect, to somebody saying yes as to theft within the company, which I think you're asking if it could be specific, that you could have contractual right that you can't be terminated unless you have a right to, unless you go through whatever process is specified. But that, in this case, isn't what happened. In fact, the primary reason that he was terminated was the fact that he was being insubordinate again. And the fact is that plaintiff, you know, even if there was some kind of policy that negated his admiral status, which we firmly, firmly argue is not the case, the fact is that he had been disciplined for insubordination a couple of months earlier, and in that write-up, it was said if you're insubordinate again, you will be terminated, or you will be subject to additional discipline up to including termination. That's what happened here. Thank you very much. Mr. Mann, what will you argue? Your Honor, one of the questions I sometimes ask myself with this particular case is if there was actually a post-accident policy, which has never been provided, did the employer actually follow it as well? It seems to me that any such policy, if it actually existed, would have indicated the time is of the essence, would have defined what an accident actually is or was, and would have set forth the procedures that needed to be followed. However, in the absence of having any discovery on that matter, we don't know. One of the things that I'd like to address is this concept of needing to prove malice in an intentional interference count. We've cited, too, a Supreme Court case in Kiewit, which basically indicates that in the context of, first of all, it indicates that the burden of privilege rests on the party that obviously is bringing it up, and that the standard is that someone needs to, in order to survive that privilege, if the privilege is actually, the burden has actually been met, then it's up to Kevin Nost to indicate that there was a reckless disregard for his rights in light of the information that was out there. Now, one of the things that kind of gets convoluted in the briefs is the application of this Federal Motor Safety Administration. And one of the points that I try to bring out is the fact that we didn't even get to step A as far as does this act even apply here. In order for the Federal Motor Safety Administration provision that insulates these employers from making the types of statements that were made here is that you actually have to prove that it was an accident. It's a disabling damage, meaning damage which precludes departure of a motor vehicle from the scene of the accident. Counsel, I have to query you. If it's not an accident, what is it? An intentional bogging down of the truck? An act of God? I mean, was it an act of terror? In order to make your argument seem rational, you have to basically explain that this really wasn't an accident in the common sense. So if it wasn't, what was it? Well, it was a truck got stuck in the mud. The only point I'm trying to make, Your Honor, is that that incident doesn't seem to fit within the definition of what an accident is under the Code of Federal Relations. I'm not sure if I... Well, I've seen people get stuck in a lot of things, and some people get stuck because they're incredibly ignorant, stupid, or naive. Other people get stuck because despite their best efforts and the highest IQ possible, they got stuck. So the point is, when you start talking about what is an accident, you're talking about something other than... Well, it could be negligence. If you talk about automobile accidents, they can be acts of God or they can be negligent acts. So I guess what I'm asking you is, was this an act of God or was this an act of negligence? And if it was or were, are they in or outside the definition of accident, especially for purposes of the Federal Act? It's outside the definition of accident under the Federal Act. The Federal Act contemplates a situation where a truck or whatever this applies to actually has to be towed somewhere. It can't drive off on its own volition. But wasn't this truck towed? It was towed. It was towed out of the mud. And then Kevin Noss continued with the same truck. Unless the vehicles are disabled, it is not an accident, regardless of how it gets there. That is the Federal Motor Safety Administration's position, that the definition of disabling damage means damage which precludes departure of a motor vehicle from the scene of the accident in its usual manner. So is it an act of malice to respond to this because, according to your argument, this really wasn't an accident and therefore they really weren't privileged in responding, should they have been as esoteric as you are and said, hey, this really wasn't an accident. But we had a policy that said that when we tell you to go take a drug test, you go take a drug test. You can answer the question if you want me to repeat it. Could you please repeat it so that I'm clear? What's two and two? No, seriously. How are they supposed to determine when they respond to these things? When this type of request comes in, do they give it to a lawyer to say, does this actually come within the parameters of the statute and therefore we have to respond or we can say the statute doesn't apply so therefore we're not going to respond? And if they go through this process and come up with a wrong conclusion, is that subject to the privilege or is that not subject to the privilege? Well, if they don't consult an attorney, they probably should. It's a complicated regulation, as I found out. I mean, there's many components and requirements for both the employee and the employer. What if they had said, as was inquired by my colleagues, that they had said he was fired because he refused to take a blood test, and if you agree that that's what in fact happened, what difference does it make whether or not it was an accident or not? I don't know how you can prove actual malice even if it wasn't in compliance with the requirements of the act. I've never taken the position that malice is even an element here. In the cases that we cite in Fallhauer and Kiewit, malice is a concept that attaches to defamation. We're not indicating defamation here. How could it even be a negligent misrepresentation? An intentional misrepresentation? Negligent misrepresentation. Negligent in the sense that it's not true, but somebody thought it was or reasonably thought it was. And our argument at the pleading stage is that that was not a reasonable position, that they went ahead and communicated the policy, whatever ghost policy that was, in reckless disregard of the information that they knew it to be. If this malice that we're calling malice, if that does not apply, is any factual inaccuracy actionable? You're saying there's a factual inaccuracy in that reporting, in that there was no accident policy or whatever your argument is. So we're taking it out of this malice aspect. Right. Are you saying that any factual inaccuracy would be actionable in the court of law? I believe that if what is stated is in reckless disregard of what is known regarding what happened at that time, that yes, it could be actionable. Do you have any response to Ms. Murphy's comments regarding the inadmissibility of the administrative proceedings as evidence in your litigation here? The only response I have to that is if those particular decisions were brought up to address the knowledge element of the intentional interference, that it was known that they had not produced policies, that there were things that were brought up. So that's why those particular, at the pleading stage, that's why those were brought up. It sounds like you're saying that an inconsistent statement or representation that might constitute an admission against interest? Correct. We thank the attorneys for their arguments today, and the case will be taken under advisement. Thank you.